IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHERYL JAMES, ET AL., | : | Civil Action No. 4:10-CV-01534 |
| | : | |
| | : | |
| Plaintiffs, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF WILKES-BARRE, | : | |
| ET AL., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**
August 19, 2015

Pending before this Court is a motion for summary judgment filed by

Defendant Charlie Casey.  The motion seeks to dismiss all claims against him,

including Plaintiff Cheryl James' claims for false arrest, false imprisonment, and

excessive force under the Fourth and Fourteenth Amendments, as well as state law

claims of assault and battery, false imprisonment, and intentional infliction of

emotional distress.  The matter has been fully briefed and is now ripe for

disposition.  In accordance with the following reasoning, Defendant Casey's

motion for summary judgment is granted in part and denied in part.  Summary

judgment is granted on Plaintiff's state law claims, her claims under the Fourteenth

Amendment, and her excessive force claim under the Fourth Amendment.

1

Summary judgment is denied with regard to Plaintiff's Fourth Amendment claims of false arrest and false imprisonment.

# I. BACKGROUND

This case arises from a series of events leading to the involuntary commitment or attempted involuntary commitment[1] of the Plaintiff, Cheryl James, at the Wilkes-Barre General Hospital by Defendant Charles Casey, a Wilkes-Barre police officer, on September 29, 2009.  Def.'s Statement of Facts ¶ 1, 46, 61, January 29, 2015, ECF No. 179 (hereinafter, "Def.'s SOF").  Defendant Casey is a member of the City of Wilkes-Barre Police Department. *Id.* ¶ 1.  Many of the underlying facts are disputed and this Court will acknowledge those discrepancies where relevant.[2]  Although many facts are at issue in this case, the Court will only address those relevant to Defendant Casey's involvement in the underlying events and the instant motion.

---

[1] This Court is unclear as to whether Plaintiff was ultimately officially involuntarily committed to the Wilkes-Barre General Hospital.  Regardless, the analysis remains the same and the Court will refer throughout this memorandum to the act of escorting Plaintiff back to the hospital as her involuntary commitment for ease of understanding.

[2] In his reply brief, Defendant argues that this Court should essentially strike Plaintiff's Statement of Facts because they do not comport with Local Rule 56.1.  That rule provides:

> A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.  The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.  Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.  All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

L.R. 56.1.  Plaintiff's Statement of Facts are neither short and concise, nor responsive to the numbered paragraphs set forth in Defendant's Statement of Facts.  However, this Court will not resort to such an extreme sanction as to deem admitted all of Defendant's facts.  Importantly, in many instances the record actually speaks for itself.

On September 28, 2009, Plaintiff's daughter, Nicole James, intentionally ingested a large quantity of Ibuprofen and attempted to overdose. *Id.* ¶ 23. Plaintiff accompanied her daughter to the hospital, where doctors tested her blood and determined that her bloodwork was normal. *Id.* ¶ 27, 29; Pl.'s Statement of Facts ¶ 29, March 12, 2015, ECF No. 194 (hereinafter, "Pl.'s SOF"). Shortly thereafter, Plaintiff called a taxi and left the hospital with her daughter. Def.'s SOF ¶ 30-31. The parties dispute whether Plaintiff was told that her daughter was free to leave prior to a mental health examination. *Id.* ¶ 32; Pl.'s SOF ¶ 29-30.

After Plaintiff left the hospital with her daughter and was getting into the taxi, hospital security officers followed her out of the emergency room and told her that she could not leave. Def.'s SOF ¶ 36-37. The hospital security officers called the Wilkes-Barre Police Department and requested assistance with a mental health or crisis situation involving someone taking their child out of the hospital against the advice of the hospital. *Id.* ¶ 46. Defendant Casey was on duty that night and responded to the hospital's request for assistance. *Id.* ¶ 45, 47. At some undetermined point, Plaintiff's daughter voluntarily got out of the taxi and was escorted back to the hospital. *Id.* ¶ 39-40. It is unclear whether this occurred prior to or subsequent to Defendant Casey's arrival; however, it is clear that Nicole James had already returned to the hospital prior to the events at issue in the current motion.

When Defendant Casey arrived, he alleges that he witnessed Plaintiff bang her head on the outside of the taxi cab. *Id.* ¶ 49. Though in his Statement of Facts Defendant characterizes this incident as occurring more than once, in his deposition he could not remember specific details of the event. In fact, what he actually claimed was that "she banged her head off the car and I stopped her from banging her head off the car. . . . I can't imagine that it was only one time, but I don't really recall whether it was just once or more than once. I'm reasonably sure that it probably was more than once." Casey Dep. at 22:13-22. Plaintiff disputes that she ever banged her head off of the taxi cab.[3] Pl.'s SOF ¶ 49.

Shortly thereafter, Plaintiff claims that Defendant Casey told the other police officers or hospital security personnel to take her back to the hospital, which they did. *Id.* ¶ 61; Def.'s SOF ¶ 61-62. Apart from alleging that Plaintiff had banged her head on the taxi, Defendant Casey maintains that Plaintiff was escorted back to the hospital without incident, meaning that she did not resist the efforts of the officers or security personnel. Casey Dep. 16:15-17; 24:3-8. It was obvious to Defendant Casey that Plaintiff was under the influence of alcohol at the time of the incident and, after she was committed to the hospital, it was determined that she had a blood alcohol content of .223. Def.'s SOF ¶ 69; Casey Dep. 18:22. It is also undisputed that on the night in question Plaintiff had taken various prescription

---

[3] As will be discussed further on in the opinion, both parties demonstrate some evidence in support of their positions.

medications, including Seroquel and Cymbalta. Def.'s SOF ¶ 14.  While at the

hospital, Plaintiff was restrained and sedated by hospital staff.  *Id.* ¶ 67, 75.  She

was ultimately released from the hospital at around 9 p.m. on the following day,

September 29, 2009. Pl.'s SOF ¶ 102.  After her release, she noticed several large

bruises on her body, primarily on her upper arms and shoulders, which she believes

were caused as she was being escorted back to the hospital, although she could not

say for sure. Def.'s SOF ¶ 92-93; Pl.'s SOF ¶ 92-93.[4]

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" where it "might affect

the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  A dispute is "genuine" where "the evidence is such that

a reasonable jury," giving credence to the evidence favoring the nonmovant and

making all inferences in the nonmovant's favor, "could return a verdict for the

nonmoving party." *Id.*

The burden of establishing the nonexistence of a "genuine issue" is on the

party moving for summary judgment. *In re Bressman*, 327 F.3d 229, 237 (3d Cir.

2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J.,

---

[4] Specifically, Plaintiff states in her deposition, "I believe that [the bruises] were inflicted on me when I was being forcefully escorted into the hospital.  True, I don't know what happened to me after I was sedated, but that's what I believe because I remember being pulled by my arms." C. James Dep. 199:20-24.

dissenting)).  The moving party may satisfy this burden by either (i) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  *Id*. at 331.

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Anderson*, 477 U.S. at 248–50.

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co*., 311 F.3d 226, 233 (3d Cir. 2003).  Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

In deciding the merits of a party's motion for summary judgment, the

Court's role is not to evaluate the evidence and decide the truth of the matter, but

to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

Credibility determinations are the province of the factfinder, not the district court.

*BWM, Inc. v. BMW of N. Am., Inc*., 974 F.2d 1358, 1363 (3d Cir. 1992).  Although

the Court may consider any materials in the record, it need only consider those

materials cited. Fed. R. Civ. P. 56(c)(3).

## III. DISCUSSION

### A. Fourth Amendment Claims

#### 1. Excessive Force

Defendant first argues that Plaintiff has not proven her excessive force claim

because any force used on her was *de minimus*.  Plaintiff responds that she suffered

extensive bruising and deep welts which are not the marks of *de minimus* force.

Though this Court is skeptical that Plaintiff has even alleged a claim of excessive

force based on one vague paragraph in her complaint, this Court will address the

sufficiency of this claim nonetheless.

"In addressing an excessive force claim brought under § 1983, analysis

begins by identifying the specific constitutional right allegedly infringed by the

challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Once the court has determined the constitutional right infringed, the plaintiff's

excessive force claim will be evaluated by reference to the specific constitutional

standard which governs that right. *Id.* In this case, Plaintiff's excessive force

claim arises in the context of the involuntary commitment of a free citizen;

therefore it is properly characterized as asserting a violation of her Fourth

Amendment rights. Consequently, the constitutionality of Defendant's conduct

will be analyzed by reference to the Fourth Amendment's prohibition against

unreasonable seizures, meaning that this Court must determine whether the alleged

seizure of the Plaintiff, including the amount of force used, was reasonable. *See*

*Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).

In determining whether a police officer's actions were reasonable pursuant

to the Fourth Amendment, the court must examine the totality of the circumstances

of the particular case, including "the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight."

*Graham*, 490 U.S. at 396. The court must evaluate the reasonableness of the

officer's actions from the perspective of a reasonable officer at the scene[5] and the

---

[5] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense,

test remains an objective one which focuses on the objective reasonableness of the officer's conduct rather than his or her subjective motivations and intentions.  *Id.* at 397.

It is clear that no reasonable jury could find that the officers who escorted Plaintiff back to the hospital used excessive force, even giving credence to the evidence favoring the Plaintiff and all inferences therefrom.  To begin with, Defendant Casey recalled that Plaintiff walked back to the hospital and that she was escorted without trouble or resistance.  To an extent, Plaintiff corroborates this version of events when she initially stated in her deposition that she walked back into the hospital on her own two feet, albeit while being escorted by either police officers or security guards, one on each side holding her arms.  She further states that they were "pulling at" her.  In response to further questioning at her deposition Plaintiff added, "I believe that [the bruises] were inflicted on me when I was being forcefully escorted into the hospital.  True, I don't know what happened to me after I was sedated, but that's what I believe because I remember being pulled by my arms."

To the extent that "pulling" constitutes the use of force in an arrest, it is clear that no reasonable jury could find that the "pulling" described by Plaintiff, which occurred while the officers or security personnel were escorting her to the hospital,

---

uncertain, and rapidly evolving – about the amount of force that is a necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

could constitute excessive force in these circumstances.  Especially given that Plaintiff admits that she walked on her own while simultaneously being escorted by the officers, it is clear that any pulling that was done was minimal and therefore objectively reasonable in a situation which both Plaintiff and Defendant agree was incident-free.

Plaintiff attempts to rely on the bruises that she suffered as evidence that the Defendant used excessive force.[6]  However, she has put forth no evidence that the bruises were caused as she was being escorted other than a vague statement that she believes they were inflicted on her when she was "pulled" by the officers. Moreover, even if the bruises were caused by the officers or security personnel escorting Plaintiff back to the hospital, it is not the injury itself which creates a constitutional claim; rather it is the conduct of the officer.  And while the injury can provide evidence as to the conduct of the officer, the abstract assertion of such an injury cannot contradict the first person account of the Plaintiff, who stated only that the officers were "pulling at" her, which is not conduct that would ordinarily create extensive bruising and deep welts.  Consequently, Plaintiff's claim for use of excessive force, to the extent she makes such a claim in her complaint, is dismissed.

---

[6] This Court has not had the opportunity to view Plaintiff's "extensive bruising" and "deep welts," given that she did not include such photographs as exhibits to her opposition papers.

2. <u>False Arrest</u>

Next, Defendant argues that summary judgment should be granted against Plaintiff on her Fourth Amendment false arrest claim.  In support of his contention he argues first that there is no evidence in the record that he arrested or seized the Plaintiff.[7]  Second, he contends that even if this Court finds that he did arrest or seize the Plaintiff, he clearly had probable cause to do so based on her behavior at the time.  Plaintiff responds that Defendant Casey did seize her and, further, that probable cause did not exist to involuntarily commit her to the hospital at the time of the incident.

To state a claim for false arrest, a plaintiff must establish that: (1) there was an arrest; and (2) there was no probable cause for that arrest. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012).  Defendant has not argued that there was no arrest or seizure,[8] only that he did not commit the arrest and that if the

---

[7] This is effectively the same argument that Defendant makes in the beginning of his brief in which he claims that Plaintiff's Fourth Amendment claims must fail because he was not personally involved in the seizure of the Plaintiff. In that argument, Defendant contends that all of Plaintiff's constitutional claims must be dismissed because she cannot demonstrate that he was personally involved in the actions which she alleges led to a violation of her constitutional rights.  Rather, he argues, because he did not "forcibly arrest, imprison, or do anything violent" to the Plaintiff, her claims cannot proceed.  Plaintiff responds that Defendant Casey was the only police officer who spoke with Plaintiff outside the hospital and he directed the other officers and security personnel to bring her back into the hospital.  Therefore, she contends, even though there is no evidence that Defendant was physically involved in Plaintiff's restraint, he was clearly personally involved through his direction to the other officers.  The Court will address this argument within the context of Plaintiff's false arrest claim.

[8] To the extent that Defendant does make this argument, the Court disagrees. "A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000).  Moreover, "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement." *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992).  Viewing the facts in the light most favorable to the Plaintiff, Defendant ordered the other officers to take her and she was escorted by means of two officers or security guards guiding or pulling at her arms, back into the hospital where she was ultimately restrained and held for close to twenty-four hours.  Given that Plaintiff was not free to leave the hospital, this conduct constitutes a seizure within the meaning of the law.

Court determines there was an arrest, he had probable cause to do so.  This Court

will address each of these two arguments in turn.

a.    Personal Involvement

It is elementary that a defendant in a civil rights action must have personal

involvement in the alleged wrongdoing. *See Evancho v. Fisher*, 423 F.3d 347, 353

(3d Cir. 2005).  Plaintiffs can demonstrate personal involvement through

"allegations of personal direction or of actual knowledge and acquiescence." *Rode*

*v. Dellaciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

In this case, viewing the facts in the light most favorable to the Plaintiff,

Defendant Casey was personally involved in her arrest or seizure because he

specifically directed the other officers or security guards to take Plaintiff back to

the hospital and thereafter prepared the incident report. While it is true that

Plaintiff did not know the identities of all of the officers, she has testified that the

officer with whom she was talking was the one who directed the others to escort

her back into the hospital.  Moreover, Defendant Casey testified at his deposition

that he was the one who was talking with Plaintiff outside the taxi that night.  It is

no logical leap to determine that the Defendant was the officer who ordered

Plaintiff to be escorted back to the hospital.

Moreover, Defendant's argument that he was not personally involved

because he did not apply any force and was not involved in physically escorting

12

Plaintiff back to the hospital is legally erroneous.  The requirement of personal

involvement is not synonymous with the application of force or physical contact,

especially given that force or physical contact is not even an element of all

constitutional violations.  Rather, the defendant need only be involved in the

violation through personal direction or knowledge and acquiescence.  Here,

viewing the facts in the light most favorable to Plaintiff, Defendant Casey

personally directed the other actors to seize her and was therefore personally

involved for the purposes of Plaintiff's false arrest claim.

    b.  Probable Cause

   The law of the state where the arrest or seizure occurred controls whether the

arrest was valid.  *See United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).  In

Pennsylvania, involuntary commitment is regulated by the Mental Health Practice

Act (hereinafter the "MHPA").[9]  The MHPA states that:

> Whenever a person is severely mentally disabled and in need of immediate
> treatment, he may be made subject to involuntary emergency examination
> and treatment.  A person is severally mentally disabled when, as a result of
> mental illness, his capacity to exercise self-control, judgment and discretion
> in the conduct of his affairs and social relations or to care for his own
> personal needs is so lessened that he poses a clear and present danger of
> harm to others or to himself.

50 P.S. § 7301(a).  The statute further provides, "Clear and present danger to

himself shall be shown by establishing that within the past 30 days . . . (iii) the

---

[9] "[T]he MHPA authorizes seizures that are 'reasonable' under the Fourth Amendment." *Doby v. DeCrescenzo*, 171 F.3d 858, 871 n. 4 (3d Cir. 1999).

person has substantially mutilated himself or attempted to mutilate himself

substantially and that there is the reasonable probability of mutilation unless

adequate treatment is afforded under this act." 50 P.S. § 7301(b)(2)(iii).

In this case, the existence of probable cause under the MHPA to

involuntarily commit the Plaintiff hinges on her conduct prior to being escorted

back into the hospital and whether it was sufficient to lead Defendant to believe

that she posed a clear and present danger to herself.  Specifically, although

Defendant alleges generally that Plaintiff was behaving "dangerous[ly] and

erratic[ally]," as far as this Court can discern, the only dangerous behavior alleged

is that Plaintiff banged her head against the exterior of the taxi cab after her

daughter was taken back into the hospital.   Consequently, whether Defendant

Casey had probable cause to require Plaintiff to be escorted back to the hospital in

the first instance depends in large part on whether and to what extent Plaintiff

banged her head against the cab.

Both parties offer differing accounts of this issue.  Plaintiff maintains that

she never hit her head against the taxi.  Although she did admit in her mental

health evaluation that she had banged her head against the taxi, she now insists that

she admitted to that action only because she knew it was what the evaluator wanted

to hear and because all she wanted to do was go home.  Moreover, she contends

that the fact that she suffered no head injury further supports her version of the

14

facts, especially in light of the extensive bruising she suffered that night from other causes.

Defendant contends, on the other hand, that he saw Plaintiff banging her head against the taxi, although he could not remember at the time of his deposition whether she had banged her head once or multiple times.  However, in his initial incident report generated at what appears to be 12:51 a.m. on September 29, 2009, Defendant makes no mention of Plaintiff banging her head on the taxi.  Rather, he states only that Plaintiff "presented to police under the influence of alcohol and prescription medicine.  Subject had an obvious altered level of consciousness." Because Plaintiff and Defendant both offer plausible, yet divergent, versions of the facts, and because a reasonable jury could find in Plaintiff's favor that there was no probable cause for arrest, Defendant's motion for summary judgment is denied on this claim.

3. <u>False Imprisonment</u>

"[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Gorman v. Township of Manalpan*, 47 F.3d 628, 636 (3d Cir. 1995) (citing *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988)).  In other words, to state a claim for false imprisonment, the plaintiff must establish: (1) that she was detained; and (2) that the detention was unlawful. *See James*, 700 F.3d at 682-83.

Defendant contends that because the record is undisputed that he did not arrest the Plaintiff or, alternatively, that he had probable cause to do so, Plaintiff's claim for false imprisonment should be dismissed.  However, as already discussed, there are issues of fact regarding whether Plaintiff's seizure and therefore her resulting detention were lawful.  Consequently, the Court cannot at this juncture make a determination as to the lawfulness of Plaintiff's detention and therefore summary judgment is denied on her Fourth Amendment claim of false imprisonment.

## B. Fourteenth Amendment Claims

Defendant next argues that though Plaintiff also asserts the aforementioned claims pursuant to the Fourteenth Amendment, the more specific provision rule dictates that these claims should proceed solely as Fourth Amendment claims and any Fourteenth Amendment claims should be dismissed.  Plaintiff does not respond to this argument.

Under the more specific provision rule, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (citing *United States v. Lanier*, 520 U.S. 259, 272 n. 7(1997)).  Plaintiff has asserted identical claims of false arrest, false imprisonment, and excessive force under both the Fourth and

Fourteenth Amendments.  These claims are properly asserted pursuant to the

Fourth Amendment, and therefore cannot also be covered by the broad scope of the

Fourteenth Amendment.  Accordingly, to the extent Plaintiff asserts claims for

excessive force, false arrest, and false imprisonment pursuant to the Fourteenth

Amendment, summary judgment is granted in favor of Defendant Casey on those

claims.

## C. Qualified Immunity

Defendant next argues that he is entitled to qualified immunity on Plaintiff's

constitutional claims because it is clear that he did not violate her constitutional

rights and that even if he did, his actions were reasonable in the circumstances.

Plaintiff responds primarily to demonstrate the ways in which Defendant Casey's

conduct was unreasonable under the circumstances.

The purpose of qualified immunity is to protect government officials "from

liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Thus, law

enforcement officials who 'reasonably but mistakenly' conclude that their conduct

comports with the requirements of the Fourth Amendment are entitled to

immunity." *Sharrar v. Felsing*, 128, F.3d 810, 826 (3d Cir. 1997).  Importantly,

qualified immunity is intended to be an immunity from suit, rather than simply a

defense to liability, which means that its protection is effectively lost if a defendant is required to go to trial. *See Saucier v. Katz*, 533 U.S. 194, 200-1 (2001).

In determining whether a defendant is entitled to the protections of qualified immunity, courts employ a two-part test.  First, the court must consider whether the facts that the plaintiff has demonstrated make out a violation of a constitutional right. *See Saucier*, 533 U.S. at 201.  If the plaintiff has satisfied that inquiry, the court must next decide whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct.  *See id.*  The Supreme Court has recently stressed that there is no mandatory order in which to consider the two prongs of this qualified immunity analysis. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

As this Court has already discussed, there are issues of fact with regard to whether a constitutional violation occurred.  Under Plaintiff's version of the events, in which she did not bang her head against the taxi, there was a constitutional violation in that Defendant had no probable cause to seize and

involuntarily commit her.  Therefore, this Court must necessarily move on to the second prong of the analysis and determine whether the particularized right at issue in this case was clearly established at the time of the incident.

In determining whether a constitutional right was clearly established, a broad and generalized declaration that a clearly established federal right was violated is insufficient. *See Anderson v. Creighton*, 483 U.S. 632, 640 (1987) (holding that the mere assertion that the Fourth Amendment prohibits warrantless searches without probable cause and exigent circumstances was not enough to demonstrate that the right was clearly established).  Rather, in order for a constitutional right to be 'clearly established,' "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Id.* at 640-41.  Put another way, for the purposes of the qualified immunity analysis, a right is considered clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The Court must therefore determine whether, under the facts alleged by Plaintiff, a reasonable officer would have known that his conduct in involuntarily committing the Plaintiff was unlawful.  The United States Supreme Court has held that state statutes, such as the MHPA in this case, must require clear and convincing evidence that an individual poses a danger to himself or to others

19

before having him or her involuntarily committed. *See Foucha v. Louisiana*, 504

U.S. 71, 80 (1992). Consequently, "[t]here is an established constitutional right to

not be involuntarily committed to a mental institution without evidence that an

individual suffers from mental illness and poses a threat to himself or others." *Lear*

*v. Borough of Brentwood*, No. Civ.A. 02-1747, 2006 WL 456194 (W.D.Pa. Feb.

23, 2006) (citing *Addington v. Texas*, 441 U.S. 418, 425 (1972)).

Moreover, the MHPA unequivocally states that a person can be involuntarily

committed only when he or she represents "a clear and present danger of harm to

others or to himself." 50 P.S. § 7301(a). The statute goes on to specifically

delineate when a person poses a clear and present danger to him or herself,

including when the person has acted in such a manner as to demonstrate that there

is a reasonable probability of death or serious bodily injury, suicide, or when the

person has attempted to mutilate him or herself. 50 P.S. § 7301(b)(2)(i-iii).[10]

---

[10] The full text of the section is as follows:

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

> (i) The person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

> (ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

> (iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subjection, a clear and present danger shall be established by proof that the person has

With respect to whether Defendant Casey is entitled to qualified immunity in this case, the Court must view the facts in the light most favorable to the Plaintiff. In that scenario, Plaintiff had attempted to take her daughter out of the hospital and bring her home.  She called a taxi and was getting in the taxi when several hospital security guards approached the cab and told her that she could not leave. Ultimately, hospital personnel escorted her daughter back to the hospital for a mental health examination.  The police appeared at some point around this time and instructed Plaintiff that she too could not leave the hospital, even though Plaintiff had not been a patient that night.[11]  This is the point where Defendant Casey alleges that Plaintiff banged her head on the taxi; however, as discussed previously, Plaintiff disagrees with this assertion.  Defendant Casey then ordered the other officers or security personnel to escort Plaintiff back to the hospital. There is no dispute that Plaintiff's blood alcohol content at the time of her involuntary commitment was .223 and that she was on prescription medication.[12]

---

made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(2).

[11] It is unclear whether Plaintiff's daughter was still with her in the cab when Defendant Casey arrived at the scene. Though he argues in his brief that she was, in his deposition he is unable to recall whether Nicole James was at the location when he arrived.

[12] In addition to the head-banging and Plaintiff's alcohol consumption, Defendant makes an additional argument in support of his decision to involuntarily commit Plaintiff: that she was a clear and present danger to the safety of her daughter.  This Court finds this argument to be meritless. No reasonable officer could believe that Plaintiff was a danger to her daughter within those 24 hours of involuntary commitment given that the daughter had already been escorted back to the hospital and was at least in the process of involuntary commitment herself.  Moreover, this Court is not clear as to how Defendant Casey knew that Plaintiff had ingested prescription medication that night. Though he noted the information on his incident report, he could not remember whether he had asked her for that information and Plaintiff does not recall being asked about it.  Further, both parties maintain that their interaction

However, Defendant has not demonstrated that Plaintiff was acting erratically as a result of being drunk, other than being "obviously drunk." Being intoxicated, in and of itself, is insufficient to demonstrate to this Court that she was a clear and present danger to herself. A reasonable officer would not have committed an individual who was merely intoxicated but not exhibiting any extraordinary symptoms that demonstrate a willingness or capability to hurt oneself. The MHPA is clear that a person can be involuntarily committed only if they pose a clear and present danger to themselves or others. Being obviously drunk, on its own, does not satisfy any of the criteria required to demonstrate a clear and present danger. This law is clearly established, and no reasonable officer would think otherwise. Consequently, the Court cannot at this time grant qualified immunity to Defendant Casey.

## D. State Law Claims

Finally, there are also several pending state law claims against Defendant Casey, including assault and battery, intentional infliction of emotional distress, and false imprisonment. In Plaintiff's brief in opposition, she concedes that Defendant Casey is immune from liability for these claims pursuant to Pennsylvania's Political Subdivision Torts Claims Act (hereinafter "PSTCA").

---

was brief. Specifically, Defendant Casey states, "[M]y contact with Cheryl James, I don't know for how long it lasted, but it was not long . . . It was a very brief discussion, she banged her head, you know, once, more than once, less than a hundred, and she was escorted to the hospital." However, for the purposes of the instant motion, this Court will assume that Plaintiff informed Defendant about her prescription medication ingestion.

Nevertheless, she appears to argue that these same state law claims for assault and battery and false imprisonment may be brought pursuant to 42 U.S.C. § 1983, thereby attempting to circumvent application of the PSTCA. She cites to no legal authority for this proposition. Defendant does not respond to this argument.

Section 1983 is not a source of substantive rights; rather, it merely provides a remedy for violations of constitutional rights. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815 (1985). To establish a claim under 42 U.S.C. § 1983, Plaintiffs must initially demonstrate that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the complainant of rights secured under the Constitution or federal law. *See Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1998).

State law claims for assault and battery and false imprisonment do not equate to Constitutional or federal law violations. Moreover, to the extent they can be construed as constitutional violations, they are duplicative of the violations Plaintiff has asserted pursuant to the Fourth Amendment. Consequently, summary judgment is granted in favor of Defendant on Plaintiff's state law claims of assault and battery, false imprisonment, and intentional infliction of emotional distress.

**IV. CONCLUSION**

In accordance with the foregoing reasoning, Defendant's motion for summary judgment is granted in part and denied in part.  Summary judgment is granted on Plaintiff's state law claims, her claims under the Fourteenth Amendment, and her excessive force claim under the Fourth Amendment. Summary judgment is denied with regard to Plaintiff's Fourth Amendment claims of false arrest and false imprisonment.

BY THE COURT:

/s Matthew W. Brann
Matthew W. Brann
United States District Judge